Jerald Deon Coney
5710 Red Cactus Ct
Arlington, Texas [76017]
Phone Number (817) 680-0626
Email:jerryconey96@gmail.com

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| JERALD D. CONEY c/o<br>JERALD D. Coney<br><br>Plaintiff(s ),<br><br>vs.<br><br>Southwest Regional Joint Board, Local 2846, Workers United A/W SEIU and Lynne Fox, International President of Workers United,<br><br>Southwest Regional Joint Board, Workers United A/W SEIU<br>3235 South Carrier Pkwy,Grand Prairie, TX 75052 Dallas County<br><br>Lynn Fox, International President of Workers United A/W SEIU<br>22 South 22nd Street, Philadelphia, PA 19103 Philadelphia County<br><br>Defendant(s). | Case No. 4:26-CV-00713-P-BJ<br>**PLAINTIFFS AMEND ORIGINAL COMPLAINT FOR TITLE VII, 42 USC 1981, WRONGFUL TERMINATION, INTENTIONAL AND RECKLESS INFLICTION OF EMOTIONAL DISTRESS, EMPLOYMENT DISCRIMINATION AND HOSTILE WORK ENVIRONMENT,**<br>Judge: Mark Timothy Pittman<br>Dept: United States District Court<br>Action Filed: Wrongful Termination et alia<br><br>**Trial Date: Undetermined**<br>Jury Trial Demanded<br>Breech of Contract ADA, and ADEH<br>Failure of duty of representation.<br>Reserve the Right to Amend Requesting Hearing In Equity |

## COMPLAINT

**COMES NOW** Plaintiff Jerald D. Coney with Counsel (hereinafter "Plaintiff" and or Jerald and hereby files his amended Complaint against Defendant TJX COMPANIES, INC. and HOMEGOODS (hereinafter "Defendants" an or "TJX") while doing business in its official capacities collectively.

## NATURE OF THE CASE

By way of this action, Plaintiff is seeking to recover damages for the following: (1) Unlawful discrimination based on raced/national origin, disability, and gender; (2) Harassment based on race/national origin, disability, and gender; (3) Hostile work environment; (5) Failure to prevent discrimination and harassment; (6) Constructive termination; and (violation of Texas Labor Code Sections 21.051-21.061.

## THE PARTIES

1. This matter arises from an employment relationship between Jerald Coney, a Black male citizen of the United States and of the State of Texas and Defendants, Southwest Regional Joint Board, Local 2846 Workers United A/W SEIU 3235 South Carrier Pkwy, Grand Prairie, TX 75052 Dallas County., a subsidiary of SEIU Service Employess International Union.

2. Plaintiff is an individual who, at all times relevant to this matter, resided in the County of Tarrant, in the State of Texas.

3. Plaintiff is informed and believes and based upon such information and belief alleges that Defendant TJX is a Delaware corporation authorized to conduct business in the State of Texas and that, at all time relevant herein, did conduct business within the County of Tarrant, State of Texas. Defendant TJX was at all times relevant herein Plaintiff's employer.

4. The true names and capacities, whether individual, corporate, representative, or otherwise, of DOES 1 through 25, inclusive, are unknown to Plaintiff, who therefore sues them by such fictitious names. Plaintiff will seek leave to amend this Complaint to show the true names and capacities of said Defendants when they are ascertained.

5. Plaintiff is informed and believes, and thereupon alleges, that each of the Defendant, is responsible in some manner for the occurrence of herein alleged, and

that Plaintiff's injuries herein alleged were legally or proximately caused by said Defendants. Wherever it is alleged that any act or omission was or was also done or committed by any specifically named Defendant, or by Defendants generally, Plaintif intends thereby to allege, and does allege, that the same act or omission was also done and committed by each and every Defendant named as a DOE, and Defendant both separately and in concert or conspiracy with the named Defendants.

6. Key Reminder: The first write up on 06/26/24 was unilateral before the CBA contract was signed by both parties. The disciplinary process that resulted in termination occurred prior to the CBA contract's signing.

7. On 07/12/2024, the CBA contract became legal and binding, making the termination process invalid. **JURISDICTION**

8. This Court has subject matter and personal jurisdiction, Plaintiff need only make a *prima facie* showing of jurisdictional facts. Fed. R. Civ. P. 12(b)(2). This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343.

9. The Court may find that federal question jurisdiction under 28 U.S.C. § 1331 has been established initially. "[F]ederal-question jurisdiction is governed by the 'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the Plaintiffs properly pleaded complaint." *Rivet v. Regions Bank of Louisiana*, 522 U.S. 470, 474 (1998) (citation omitted). Section 1331 jurisdiction is properly invoked when plaintiff pleads a colorable claim "arising under" the Constitution or laws of the United States. *Arbaugh v. Y & H Corporation,, 546 U.S. 500 (2006).*

10. This court has subject matter jurisdiction under 42 U.S.C. § 2000e *et seq*., Title II of the 1964 Civil Rights Act (Title VII"); 42 U.S.C. § 12101 et seq., Americans with Disabilities Act ("ADA") and 42 U.S.C. § 1981

11. Section 1332 jurisdiction is also properly invoked, Defendant has its corporate place of business in Philadelphia PA., diversity jurisdiction with respect to this

action pursuant to 28 U.S.C. § 1332 as there exists complete diversity of citizenship between Plaintiff and Defendants and the amount in controversy exceeds Seventy Five Thousand Dollars ($75,000.00), exclusive of interest and costs.

12. Therefore, the Court indeed, make "[t]he assertion of a claim under a federal statue alone is sufficient to empower the District Court to assume jurisdiction over the case..." *Cervantez v. Bexar County Civil Service Commission,* 99 F.3d 730, 733 (5th Cir. 1996) *(quoting, Holland/blue Streak v. Barthelemy,* 849 F.2d 987, 988-989 (5th Cir. 1988)).

13. The citizenship of all parties are within the Jurisdiction of this Court. "For individuals, citizenship is an individual's domicile, which requires "residence and the intention to remain." *Preston v. Tenet Healthsytem Mem'l Med. Ctr., Inc.*, 485 F.3d 793, 798 (5th Cir. 2007).

14. A corporation's citizenship is the state in which it has been incorporated and the state of its principal place of business. 28 U.S.C. § 1332(c)(1).

15. Venue lies in this Court pursuant to 28 U.S.C § 1391.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

16. Prior to the filing of this action, Plaintiff filed a complaint with the EEOC and obtained a right to sue notice from said agency, which was issued on or about May 07, 2026.

## RULE OF LAW

17. Whereby this cause, being a complaint in exclusive equity jurisdiction, (as it directly involves the common-law actions and suits in equity of the Plaintiff), cites the rule of law as follows upon: With the merger of law and equity, there is only one form of action, a civil action Rule 2 of the Fed.R.Civ.Pro..

18. By using the term "action", without any restriction on its ordinary meaning, Congress intended the federal courts to have jurisdiction in Civil action over claims for both legal and equitable relief. "Equity having power and the court having jurisdiction, decrees can conform to the exigencies of the suits and award appropriate relief under the complainants general prayer." *United States v. Cooper,* 217 F. 846, 847 (D. Mont. 1914).

19. "While a court of equity, having once obtained jurisdiction of a cause, will retain it for all purposes and administer complete relief, yet in order to authorize relief which can be obtained in a suit at law, there must be some substantial ground of equitable jurisdiction both alleged and proven; otherwise a court of equity will not retain jurisdiction and grant a purely legal remedy." *Gentry-Futch Company v. Gentry,* 90 Fla. 595, 106 So. 473; *See* also 10 R.C.L. 370 to 372.

20. The suit is brought for special relief, and the judgment required to be entered is such as a court exercising jurisdiction in equity alone could render. *See Shoshone Min. Co. v. Rutter,* 87 F. 801, 804 (9th Cir. 1898).

21. "[W]here.... the equitable jurisdiction of the court has properly been invoked... the court has the power to decide all relevant matters in dispute and to award complete relief even though the decree includes that which might be conferred by a court of law.." *Porter v. Warner Holding Co.,* 328 U.S. 395, 399, 66 S.Ct. 1086, 1090, 90 L.Ed. 1332 (1946).

## FACTUAL BACKGROUND and ALLEGATIONS

22. This claim is arising out of the nucleus of operative facts previous action not barred by *res judicata*. This former employee's claim of **Wrongful Termination, Intentional and reckless infliction of emotional distress, Title VII, Employment Discrimination and Hostile Work Environment** arose out of the Plaintiff's waiting for a right-to-sue letter from Equal Employment Opportunity

Commission which purportedly prevented employees from raising a wrongful termination *inter alia* claim coupled with Medical physicians and specialists M.D.'s naming Neurologist. Defendants violated Plaintiff's Constitutional rights such that a cause of action arose out of 42 U.S.C. § 1981 and 1985.

23. Plaintiff was hired by HomeGoods Distribution center in Fort Worth Texas with a start date of 04/01/2024. HomeGoods is a retail chain owned and operated by TJX companies. TJX Also owns TJ Maxx, Marshalls, Sierra, and Homesense.

24. Before Plaintiff started on 04/01/2024 he was instructed to attend Orientation where he was told that scored high enough on the first math test to take a placement math test given to only a selected few to see if they would qualify for a preferred job within a preferred department.

25. Plaintiff took the test and was told the same day that he "Aced" the test scoring a least 90 or above that he then qualified to be placed in the Department named "Lay-up" (Quality Control) were he was told on his first day reporting and then to his Department on 04/01/2024. Shortly after Plaintiff was greeted with the Two Supervisors over that department, "Jade Casey" and later introduced to "Sarah McLaughlin."

26. These two individuals were Plaintiffs' immediate Supervisors. Jade was hands on with Plaintiff his first day of my Employment placing with a Co-worker by the name of "Maria" who was an older Hispanic lady near the age of 50 and Plaintiff was told that she would be training him for the Next 2-3 weeks and that he would be with her everyday all day to fully pick up the very detailed training that all new hires must complete when entering this particular Department.

27. Throughout the training, Maria exemplified extraordinary professional trainer skills after being hired in 2023, months after the distribution center opened. After first day things were looking promising.

28. One Day two, plaintiff reported to work on time and excited to get back into his training with Maria because they got along really well the first day and he could tell she knew her job very well. Embedded within the work structure, Plaintiff would have to attend a 5-10 minute meeting every morning were the Supervisors give updates on Performances and Expectation concerning the trainee.

29. After the meeting Jade walks up Plaintiff to state "Sorry their will be a change just for today you will be getting trained by a different Co-worker name Casey." Plaintiff walked over to her cart were she was getting all her supplies and ready to start her day. Plaintiff was introduced to her while being informed that that she would be training him for that day because Maria was needed in a different Department.

30. Casey appeared very dissatisfied and remained untalkative after meeting Plaintiff. Casey then told Jade, "do I have to train him today, I'm kinda burnt out, cuz [sic] I been training new employees for the last month." Then Jade Casey said "yes it's just for today, Maria is needed in another department today." Then Jade just walked off leaving plaintiff and her just standing there looking at one another. Casey didn't speak for at least another 15 minutes then apologized for what plaintiff heard her say in front of him and said "it's not you but I'm just burnt out on training."

31. Then Plaintiff saw Maria an hour later working on the aisles in Plaintiffs' department. He asked Maria, "what happened they told me you were moved to another department for today." She said "no that didn't happen they asked me if I wouldn't mind helping out in a different department when I wasn't required to go so I didn't." The exact same person that refuse to train Plaintiff was made to remain under her supervision for the next two weeks. Plaintiff and Maria could not understand the reason.

32. After about 3 weeks of being on the job, plaintiff started working on his on. After his two-week new hire status plaintiff started petitioning for overtime. Now,

Plaintiff was told on his first day of work with those other employees that started that day on 04/01/2024 that we were a special starting group because this was the first day that the Union (Workers United) were active in the building. This is important because when plaintiff started working, he started meeting co-workers from all Nationalities and background.

33. Plaintiff is now starting to see how the African-American employees are treated within entire Distribution center, i.e., mass firing, targeted more for Disciplinary actions as opposed to the Hispanic and foreigners in the facility. That's when co-workers started telling him "hopefully this new union will really help because I was told prior to the Union would be handling the African-Americans with a strong hand with no regard to govern "HR" Human Resource and Management." Doing as they please.

34. Plaintiff also started noticing within his department which was 80% Women and Hispanic and about 10% African American and half of that consisting of African American males. Behind the counterfeit smiles and the reassurance that you were part of this team and this Department being as though family, there were a lot of favoritism with certain people always being granted the best working aisles with all the work so Certain employees appear as though they doing great quality numbers with the appearance as to scanning the incoming inventory. African-Americans were usually on aisles that were unorganized or the aisles were almost empty giving the appearance that the employee is not doing their job or not performing as well as they should, leading to write-ups and Termination.

35. Plaintiff received his first "Write up" disciplinary on June 26, 2024, (this is when the misconduct started.) *See* **Exhibit "A"**

36. On the morning of 06/26/2024, Plaintiff clocked in around 5:58 am and his shift starts at 6:00am. Plaintiff is on A-shift from 6am until 4p, Mon-Thurs. After the routine morning meeting, Supervisor Sarah McLaughlin said "I didn't see you in the

meeting" Plaintiff replied "I was standing their along with 25-30 employees looking right at you the entire time of the meeting, I been here the whole meeting."

37. The next following day after lunch around 2pm Sarah approached Plaintiff to inform me to go visit "Jade Casey" the other Supervisor in one of the conference rooms located across from the cafeteria.

38. Plaintiff then asked Sarah, " is everything ok" and she replied "just go see Jade everything will be ok" Once Plaintiff entered the conference room Jade Casey was sitting in the back of the room with a Caucasian lady (Union rep) Plaintiff was then instructed to sit down. Seconds later, Jade slid me a document to read over, Plaintiffs responded "why am I being wrote up? I was clocked in before the shift stared, but wasn't observed being in my work area at 6 am at the start of the shift."

39. Plaintiff then expressed to her "I know I was their in the meeting because I remember Sarah asking me where I was after the meeting. And I mention of some of the things talked about in the meeting." Jade replied "it's not a big deal it's only your first write up I wouldn't read to much into it." Plaintiff then replied "basically I'm being wrote up for being on time and just because a Supervisor claims they don't remember spotting me in the meeting now I'm been wrote up." My Supervisor begin to the get agitated and more aggressive, then stated "are you gon [*sic*] sign it or not because the write- up stands and there is nothing else to discuss."(emphasis add).

40. Plaintiff then replied "no I want sign this because why can't we pull the film because we have cameras everywhere throughout the facility and this issue can easy be proven plus I know I clocked in on time and was in my area at 6:00am, so why would I sign that and are we finished here" then plaintiff stated "I will be getting with a union official to find out my rights" the meeting was adjourn.

41. This happened approximately 90 days after plaintiffs being hired. In fact, he has never displayed tardiness or missed any days for the first 90 days of starting this position, that's why he was so surprised, astonished and confused.

42. The new Cba (Collective Barging Agreement) contract states that "you can let any employee go with no cause at all within the first 60 days of employment because after an employee has been employed for 60 days you have started the Disciplinary steps per the CBA Contract Agreement."(emphasis added)

43. This changed the entire dynamics of plaintiffs work environment even though it really was leading up this calculated attack on him and other African-American men in that department. Plaintiff noticed after he refused to sign the first write up, he then summons the New Union to get involved, because he now realize that he has become a huge target, being that he was 51 years old and knowledgeable of how unions work and how employees are supposed to be treated and represented by the union having worked in jobs in his past with a prior strong presence.

44. Plaintiff expressed this to "Clemente Guzman" the Business agent for Workers United and the top leadership personnel to handle grievances and disputes between HomeGoods and the Union of all employees.

45. Plaintiff then asked Clemente for a Union CBA handbook, he was told "nobody in the facility had one, nobody been issued one yet and that they were on backorder and should be arriving at the distribution center soon [*sic*]." This occurred in late June early July of 2024, over 3 months later after the union had allegedly entered the facility back in April of the same year. But still no employees had Cba handbooks to know their rights and to read over the whole contract.

46. So now Plaintiff has become a threat, better yet disruption because he's now asking the Union and HR for the official Union contract handbooks that they were promising are on the way. Jerald was being told this for the first 3-4 months after he started but of course they never showed up.

47. Later, in mid July 2024, a co-worker named "Derek" an African-American man that started approximately two months after Jerald in his mid-30's. Derek worked in the department labeled "Lay up" along with Jerald, Derek walked up to

Jerald one day and stated "Man I just got wrote up today for the second time for being to work on time but they keep saying they didn't see me in my area at 6:00am but I remembered me and you both clocked in around 5:57 am." Jerald and Derek were talking while walking in their work area that particular morning" Jerald abruptly stopped dead in his tracks and looked at him and said "You Too, they wrote me up for the same thing a few weeks ago" Jerald indicated to him that "I didn't sign the write up" Jereld asked him if he had signed the two write-ups for clocking in on time but not being seen in his area at 6:00 am and he said "Yes" he stated "unlike you I haven't made my 90 days yet or even 60 days yet were they can let me go with no cause so I really can't say anything or buck because they can then just walk me straight out the door [*sic*]." (emphasis added)

48. By now, Jerald and Derek both privately started asking some of the women co-workers mostly Hispanic and they stated they had never experienced that or heard of that reason before. Then, mid-July Jade walked up to Jearld one day and stated "I'm not for sure but if you are, stop talking to your co-workers about Union business." Jerald was then wrote up for being on his phone inside the facility, allegedly this made his Second write up that he again refused to sign.

49. Then the Retaliation became blatant to the point Jerald asked could he work away from Jade Casey on the other side of Distribution center because one supervisor controlled the South side every day and the other controlled the North side. It had gotten to a point where she was asking Jearld 15-20 times a day "are you ok, just want to proof check your work and make sure you don't need any assistance."

50. It had gotten to a point where Jerald politely told her "I can't work under these conditions being helpful is one thing but being micro-managed and feeling like I was even being targeted and harassed." With a smirk smile she just stared. "I feel like your trying to catch me doing something wrong." She never responded.

51. In early August 2024 Jerald witnessed other employees working on his shift from another shift that were there for overtime. Jade assigned all the aisles where all employees would be working for that day and once Jerald made it back to his aisles they were almost empty and when he checked with the receiving department they said it might be a couple of hours before those lanes would have any Inventory to check in.

52. Jerald later went and observed employees from the other shift with aisles that had plenty of work so Jerald went and made his observation known to his supervisor Jade Casey, because previously the employees whose actual shift they were all working is supposed to work the aisles with the most inventory first!! Why? Because they're getting graded on performance and your inventory count. Overtime employees are not being held to the same measuring stick because their volunteering to just help out on their days off. However, this is Jerald's regular work day and have hardly any work, but Casey's favorable employees from the overtime crew would receive the better aisles to work. From time to time, Jerald would ask her "why is this, that you are showing favoritism toward certain employees" she replied "you will have work from receiving eventually until then you can just pick up a broom and stay busy until they unload some trucks and bring you some inventory to scan in."

53. At this point Plaintiff is now starting to feel discriminated and retaliated against from his supervisors. "Grant Sheel" (White man) the area supervisor over (lay-up) was primarily the one directing her. Then on the same day after about (4) hours, they brought Plaintiff some inventory to his aisles. When Jearld left to go use the restroom, two Hispanic women came over and started working on his aisles and taking his numbers. Jearld politely explained to them that these were his assigned aisles, but they insisted, because Jade said they could work wherever they like. Jearld left to speak with Jade and explained to her "that if I couldn't get these

numbers off my aisles it will look like at the end of the day that I practically did nothing all day and that can lead to a write up."

54. When Jade and Jearld were walking, Jade made mention that another group of employees were working "your" aisles. I stopped and waited and stated, "that's unacceptable" she then went and spoke to them about something. Jade, then proceeded to walk pass Jearld without any explanation, Jerald then stated, "what happened, did you tell them that you assigned me these lanes" Jade replied, "yes, but it seems their almost halfway through the lanes so I told them they could finish just this one time " Jearld just shook his head and walked off."

55. Two days later Jearld started working from the same end of the aisle, Jade excused the two women working his lanes and when Jade saw this, she then walked straight over to Jearld and stated "why did you start on this end?" Jearld explained "you said it was ok two days ago" Jade became extremely angry and walked off. Later on in that day she asked Jearld to report to the conference room and wrote him up for a third time *See* **Exhibit**("B")

56. Not long after Union representative "Diamond Holbert" witness and wrote a statement that Jade admitted to letting to women work from the back of the lanes and excused this behavior. But as soon as Jearld did this same act she wrote him up. See **Exhibit (B1-Write up)**

57. On August 20, 2026 Jearld clocked in at normal time, 6:00am, he proceeded to work his shift when Jade assigned him to work directly in front of her desk. This went on for several days "retaliation" and "intimidating tactics of harassment." From 12:00p to 12:30p employees are in relief of lunch. Jearld clocked out for lunch like all employees must to do, by now Jearld has become stressed out, Jearld immediately set and appointment to see his "PCP" Primary Care Physician simultaneously calling to HomeGoods call-in line to take the remaining day off.

58. When Jearld was seen by his physician, his physician described how his "PTSD" was extremely elevated. Jearld physician immediately took him off work for 30 days. HomeGoods has a department called "HR Express in Massachusetts" that approves all requested leaves from employees. Jearld called the HR department for HomeGoods on August 20,2024 after he received his medical leave paperwork from HR Express he then informed the HR department for HomeGoods in Fort Worth. Jearld was then instructed to call the call-in line every day until his leave was approved and being that his doctor took him off work for 30 days starting August 20, 2024, Jearld would not accrue any points, so he did as instructed.

59. On the morning of August 28, 2024, Jearld received his first short term disability check and an email showing that he was approved for my medical leave for the 30 days along with his short-term disability. (Show any exhibit proving the short term disability). The next day Jearld received a notice via us mail that he had been terminated for two violations that did not exist from his best practices and expectations that he had signed on 06/04/2024- See **Exhibit "C"**

60. The Termination letter stated that Jerald "was observing breaking "two" violations on August 15, 2024" (emphasis added) the letter did not state who witness these allege violations. On August 15, 2024 that Fri-Sun Jearld was approved to work all three of his off days coupled with Jade Casey approving a paid day off for him on this day where he requested to be off work on August 19, 2024 which was also granted for him to return on August 20, 2024.

61. Yet no one ever mentioned these alleged violations the entire three days Jerald worked inside the facility while on a ten-hour work days from August 15-18. Now, approximately (13) days later after Jearld was approved for medical leave and already received his first short term disability check to terminate me through the mail.

62. Jerald received an email late July 2024 were the company commanded the entire Lay-up department leave the floor for a meeting were all employees and supervisors were instructed that all the layup departments from all different shifts would have to give the employees only in this department time to receive a retrain class on process and math calculations process because the supervisors were not all "on the same page" See **Exhibit "D"**.

63. Shortly after, approximately three weeks later, Jerald was terminated. He was terminated for travel tags and overages through the mail when a meeting was just conducted two weeks prior August 15, 2024 where he was to supposed to be observed for not using his travel tags and overages which is math, but the email will show no employees in the Layup department should be audited because of the New training taking place.

64. But they still held Jerald accountable. Now that Jerald has now been terminated, he has now started interacting "Clemente Guzman" who is the business agent for the Union. Right from the beginning of Guzman interaction, Jerald noticed his standoff, bias unprofessional attitude, but Jerald remained quiet.

65. Right from the beginning, Guzman started giving Jerald misguided information. At the grievance meetings to get fight for the right to receive his employment back Guzman misrepresented him with prejudice. Guzman never made mention the factual evidence the two had discussed prior to the meeting that would surely place another light on his case. He conventionally rephrased the question and totally avoided the real valid questions. When Jerald would speak, Guzman would abruptly interrupt as to make it appear that he was trying to interject to help the tone of the meeting but really the opposite.

66. This conduct carried on from September through November with always the same results, each grievance was lost even "Leave of Absence."

67. As a further direct, proximate, and legal result of Defendants' unlawful conduct as alleged herein, Plaintiff has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities in an amount not currently ascertained, but which will be proven at trial. Plaintiff is, therefore, entitled to general and compensatory damages in an amount to be proven at the time of trial.

68. As a further direct, proximate, and legal result of Defendants Texas Labor Code violations as alleged herein, Plaintiff will be compelled to retain the service of an attorney as needed in an effort to enforce the terms and conditions of the employmen relationship with Defendants, and to redress its violation of the Texas Labor Code and has, thereby, incurred and will continue to incur legal fees and costs, the ful nature and extent of which are presently unknown to Plaintiff, but which ar recoverable at trial.

**THIRD CAUSE OF ACTION**

**Retaliation in Violation of Tex. Code Section 21.055**

69. Plaintiff incorporates and re-alleges by reference all previous paragraphs, and each and every part thereof, of this Complaint, with the same force and effect as though fully set forth herein.

70. At all times herein mentioned, Plaintiff was engaged in protected activities in reporting and complaining about conduct by, among others, his former supervisor and Defendant (JADE CASEY), that he believed was unethical, illegal, and discriminatory under the laws of the State of Texas, to responsible agents and employees of Defendant TJX.

71. As a direct, proximate, and legal result of Plaintiff's having engaged in protected activities as alleged herein, Defendant (JADE CASEY) took adverse employment actions against him as herein alleged.

72. Plaintiff is informed and believes and upon such information and belief alleges that, given the close proximity in time between Plaintiff's having engaged in the

protected activities as alleged herein and the adverse employment actions that were taken against him, a legal nexus and causal link exists between those protected actions and the adverse employment actions taken against him by Defendants as alleged herein.

73. As a direct, promimate, and legal result of Defendant's willful, knowing, and intentional retaliation against Plaintiff in the workplace, Plaintiff has suffered and will continue to suffer medical nerve pain, humiliation, stress, anxiety, and emotional distress, all of which are not currently ascertained, but which will be proven at trial. Plaintiff was further prevented from performing one or more of his essential job functions, thereby causing him loss and damages to this professional reputation and opportunity to advance I his career with TJX.

74. As a further direct, proximate, and legal result of Defendants' willful, knowing, and intentional discrimination/retaliation against Plaintiff, Plaintiff has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities in an amount not currently ascertained, but which will be proven at trial. Plaintiff is, therefore, entitled to general and compensatory damages in an amount to be proven at the time of trial.

75. Defendants committed the acts alleged herein maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malic, and in conscious disregard of Plaintiffs' rights. Plaintiff is this entitled to recover punitive damages from Defendants, and each of them, in an amount according to proof.

## FORTH CAUSE OF ACTION

## Constructive Termination

76. Plaintiff incorporates and re-alleges by reference all previous paragraphs, and each and every part thereof, of this Complaint, with the same force and effect as though fully set forth herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants and for the following relief:

A. That judgment be entered against Defendants for special damages, compensatory damages, and punitive damages in an amount which shall be shown to be reasonable and just by the evidence and in excess of Ten Million Dollars ($10,000,000.00), exclusive of interests and costs;

B. That all costs of this action be assessed against Defendants, including all reasonable attorney's fees, costs and expenses of this action;

C. That an order of protection in favor of Plaintiff and all associated with him be issued so as to protect them from harm and harassment from Defendants and their agents and associates; and

D. Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury of all issues properly triable by jury in this action.

Respectfully submitted, this 10 th day of August, 2026.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above **ORIGINAL** to the UNITED STATES DISTRICT COURT and **ONE COPY** delivered to The TJX COMPANIES, INC., AND HOMEGOODS,LLC by certified mail return receipt requested this 10 th day of August 2026.

The TJX COMPANIES, INC., HOMEGOODS,*LLC*

**Exhibit "E"** Homegoods DC / Layup Expectations Jerald Coney signed on 06/04/2024

**Exhibit "F"** Termination letter via mail- I was terminated for two violations from the best practice and expectation that I signed on 06/04/2024 that do not exist.

**Exhibit "G** The email serves as proof that I contacted Vice President Jene Hervey. She then learned from the email that the first write-up on 06/26/2024 was completed before the brand-new CBA (collective bargaining agreement) took effect,which became effective 07/12/2024. Therefore, the termination process was invalid. Ms. Hervey failed to respond by the 05/06/2025 deadline for the arbitration hearing, which would have been void due to new discoveries. Meanwhile, TJX and the Union presented me with a $10,000 settlement 04/17/2025.

**Exhibit "H"** 10,000 Settlement offer from TJX

**Exhibit "I"** The document showing when the Employer and the Union signed the contract. Jene Hervey signed the new CBA contract on 07/12/2024, which resulted in the CBA becoming legal and binding.
The New CBA stipulates that all legal and binding provisions are fixed and that no additional provisions will be incorporated.

**Exhibit "J"** Email to Tiffany Morris, an investigator for SEIU.
This email shows I reached out to the SEIU for support and received no assistance.

**Exhibit "K"** On April 3, 2025, I sent an email to Lynne Fox seeking help before the May 6, 2025, arbitration hearing but received no response.

I have a lot more proof to provide to the court upon request, dealing with my ongoing medical condition, which was triggered by the wrongful termination.

Exhibit A

HomeGoods | HOME SENSE

**ASSOCIATE WARNING NOTICE**

HR INITIALS SRS
AGM INITIALS JS

where did he clock in

| | | | |
|---|---|---|---|
| Associate's Name | Jerald Coney | AIN: | 998487891 |
| Supervisor's Name | Sarah McCraney | DEPT: Layup | Hire Date: 4/1/2024 |

**WARNING:** ■ 1st Written ☐ 2nd Written ☐ Final Written ☐ Termination ☐ Suspension

Previous Corrective Action: Coachings Date of Issue: 6/25/2024

Where was he and what time was it

Date/Time of Violation 6/26/2024 Place Violation Occurred Layup

**NATURE OF VIOLATION**

Violation of Rules

Safety Violation? No
*Check box if yes*

**DETAILS OF VIOLATION (Please Explain)**

Jerald Coney is receiving this Corrective Action for being out of area. On 6/26/24, Jerald was clocked in and not in area at 6am. It is the expectation that all TJX associates are in their assigned area at the start of shift at 6am.

**Any further instances of inappropriate behavior and/or violation of company policy will result in further disciplinary up to and including termination of employment**

**ASSOCIATE'S REMARKS**

*The absence of any statement on the part of the Associate indicates their agreement with the report as stated.*

I have entered my version of the matter above. I have read this "warning", understand it, and have received a copy.

ASSOCIATE'S SIGNATURE DATE

OPERATION MANAGER SIGNATURE [signature] DATE 06/26/24

UNION STEWARD SIGNATURE DATE

SUPERVISOR SIGNATURE [signature] DATE 6/27/24

Refused to sign

Same as below

Please Select from List:
1st Written Warning
2nd Written Warning
Final Written Warning
Termination
Suspension
N/A

Please Select from List:
Failure to Meet DC Standards
Violation of Rules
Exceeded No Fault
3 Day Unreported Unexcused Absence (NCNS)
Violation of Safety Rules
Failure to follow Directions

RECEIVED
JUL 01 2024
BY: [initials]

Jerald Coney ... Home Goods

Exhibit B

# *Southwest Regional Joint Board*
## *Grievance Form*

Date Grievance Filled 9/01/24

Local Union # 2846

Grievance #001 9/1/24

Employee(s) Jerold Coney

Job/Dept(s) lay-up A shift

---

Nature of Grievance : On or about 8/12/24 Mr. Coney was written up on a final warning without cause.

Contract Violation: Article 15 Discipline and Discharge and any other article or sections that may apply.

Remedy Requested: That write up be stricken from Mr. Coney's associate file and that he be made For any loss of wages and or benefits that may have been lost due to write up.

---

Steward Clemente Guzman Jr.

Employee Jerold Coney

Submitted to 1st step 9/01/24 Company Representative ____________

Submitted to 2nd step ____________ Company Representative ____________

Submitted to 3rd step ____________ Company Representative ____________

Resolution of grievance (circle one)

Settlement Reached

Grievance Withdrawn

Referred to Arbitrator

Date ____________

## Facts as we know them of Jerald Coney 3rd write up,

1. On or about 8/12/ 24 Mr. Coney was written up for working and order backwards in layup
2. On or about 8/3/24 Jade Casey told us to stay in the assigned lanes until a supervisor moves us she assigned lane 17-20 to Mr. Coney.
3. When Mr. Coney arrived to his assigned lanes there was no work except on Lane 20 1 box with about 8 pallet each to be worked.
4. Waited 2 hours for lanes to fill up.
5. When approaching assigned lanes Mr. Coney
6. I saw lane 17 and 18 full of work and got excited, that's what I had been waiting for.
7. When got close to my assigned lanes 2 women on OT working my lanes it didn't seem they were there long
8. I walked to them and asked how they were doing. They were polite, I nicely asked if they knew they were working my lanes? They responded the Jade said to them they can work wherever they like.
9. I notified Jade of issue and. that I had waited 2 hours for that work, and I need my units and can be wrote up for noncompliance of my work, she said don't worry let's walk over there together and I will have them go to other lanes,
10. When Jade and I walked up to the lady's Jade pointed out to me they are not even working the lanes properly. They are working the lanes from the back when you are supposed to start at the front. I didn't say anything.
11. Jade then said I will have them relocate. Jade then approached them both women are from AC.
12. Jade, after a few minutes of conversation, was attempting to walk by me but I questioned her on the matter.
13. Her response was they have done most of the work, so I told them its ok. Mind you they were doing the work backwards by Jades own words when we approached them.
14. I asked what do I do now? Jade responded I am leaving now. Clark, another supervisor can help you. Note women continued to work the lanes backwards.
15. On or about the following week I was written up by Jade stating that I was getting written up for working the lane from back to front.
16. I responded to Jade I don/t have a clue as to what you are talking about. You jago, told me less than a week ago if most of the lane is done then it would be ok. And you just allowed to women on OT to do the lanes backwards.
17. Jade admitted twice in the disciplinary meeting to Diamond that is was true she allowed the 2 lady's on OT to work the lanes backwards.
18. Jade then proceeded to say you are still being written up. And proceeded to write me up.

It is the unions position that the company disciplined Mr. Coney unjustly as they are aware of exactly the same violation by other associates and ignored to act and write up others for same offense as admitted to by supervisor Jade in the presence of a union steward.

Mr. Coney Statment.

clent

jerry coney <jerryconey96@gmail.com>
Wed 9/11/2024 6:18 PM
To:Clemente Guzman <guzman_clemente@att.net>

The Lay-Up Expectations and Practices working Lanes From Front to Back-That the Supervisor (Jade Casey)Violated before She Then Came Right back Afterwards and Wrote a Employee up for.. Statement.

On or Around 08/03 2024 Jade Casey went home that day Around Noon after she was Approached by one of the First Shift Union Rep Dwayne Grubbs about her Questionable Write-ups and one Specially from 06/26/24 about a Very and Suspicious Petty Write up ...after he Questioned her which I Witnessed with my Own Eyes.Jade Casey whole Body and Demeanor Changed Towards Me I Felt.And I was Assigned Lanes 17-20 that Morning by Jade Casey Which we have been Told to Stay in our Lanes and our Area until a Supervisor Moves you so when I First got to my Lanes their was no Work but on Lane 20 I believe with one box on about 8 Pallets each pallet had One Box with a Dcpo on it to be Worked .So Basically this Could be Considered a Retaliation Tactic to make you work all these Orders with Practically No Unit Counts which She had been Telling us we Need 150 units Per Hour but she had Placed Overtime Employees I walked the Lanes and She was giving them Great Lanes with Units and their Count was not be Held to the Same Accountability as the Employees on the Actual Shift.so I Asked her About it and She Said they Should be Bringing you some good Units on Aisles 17 and 18 because we could See the Receivers getting Ready to Unload their Trucks.

So Finally After me waiting Two hours for my Lanes to get Filled up with New orders and Dcpo's (Work Orders) I walked to the Other Side of the Building were Jade is and asked her to Come help me with this one Order or to get her Opinion on how to do it? While we're getting Close to my Lanes Somebody Pulled her Away with a Question and that's when I Continued walking over to Aisle 17 and 18 because Now I Saw they were both Fully Filled up with the Work I had been Waiting for.

I Saw Two Women who on Overtime working on my Aisles and they Couldn't have been there Long so I walked up to Them And ask them how they were doing? And they were Polite at First and then they responded "that they where Ok'and I said Nicely "I don't know if y'all knew but these Are my Assigned Lanes" and they looked unbothered and Said "Jade said we Can work Wherever We Like."

**Part Two : To Jade Casey Violating the Lay-Up Best Practices and Expectations on and Around 08/03/2024 before She Came Right back after Violating this Rule then Wrote up an Employee for this Same Violation**

jerry coney <jerryconey96@gmail.com>
Wed 9/11/2024 6:43 PM
To:Clemente Guzman <guzman_clemente@att.net>

So after the Two Women told me this i Quitely walked Off and Jade was Close by and I Approached her and Told her of Everything plus on how I had been Waiting 2 hrs on my Assigned Aisles where I need my Units or I Could Possibly be Wrote up for Non Compliance of my job that I had Already been Threatened by Jade Casey so she Said Don't Worry let's walk over together and I will have Them go to Other Lanes because now more Aisles had More Work then at the Start of the Shift.So when me and Jade Walk up on and Between The Front of the Aisles of 17 and 18 Jade Casey brought to my Attention First and She Said" they are Not Even Working the Aisles Properly Actually they are both these Aisles From the Back when your Supposed to Start Aisles at the Front" I didn't Say Anything because she said I will have them Relocate. So Jade went and Talked to both Women who were Two Hispanic Women that works in the AC department.After a few minutes of Discussion with both Women Jade came back Towards me who and the End of the Aisles Considered the Front and acted as she was going to Pass without Saying Anything so I the said" Well what's the Conclusion she Said"Since they have Already done Most of both Lanes I Told them it's Ok and they Could Finish and Just find other lanes After they Complete what they had Started."So I said Really what "do I do " and She Said I am about Leave Clark the Other Supervisor can help you im Leaving for today.

## Supervisors :Violating the Best Practices and Expectations they are Enforcing Simultaneously....Which is Confusing and Unacceptable

jerry coney <jerryconey96@gmail.com>
Fri 9/13/2024 1:55 PM
To:Clemente Guzman <guzman_clemente@att.net>

Part Three:This is the Conclusion to the the First Statements in this Matter.And to Pick up where I Left Off Where Jade went home Early on and Around 08/03/2024
And Allowed to Women to work the Lanes back to the Front....And when She Came back she took it Upon herself to Write me up I believe the Following Week and Carl Walked up on me the Evening on my Write-up and Said Jerald" Can you walk with me to the Front" and I Already knew the What this Meant because I had been Wrote So Many Times within the Past 30 days before this Encounter i Almost was Expecting the Encounter.I just didn't Know What Reason they Would Make up Next.i walk in the Room and Jade Casey(My Supervisor) and Diamond(Union Rep)was Already Sitting in the Room waiting So as Soon as i Set Down Jade Told me Why i Was Their and That She had Already told me Previously about Working Lanes from Back to Front.
And I responded and Said Jade" I don't have a Clue too what you are Talking About you just told me less than a Week ago aslong as you got Most of the Lane Done Then it's Ok to Finish the Lane and thats Why you let the Two Women on OT Both Finish my Lanes 17 and 18 and the Camera Footage from the day She went home Early on or Around 08/03/2024 if they were to Pull the Footage will Show This. Jade Then Admitted this Behavior and Allowing both girls to Finish Back to Front on both my Lanes in the Meeting in Front of Me and Carl and Diamond and was Like Basically Yes this is True but you Are Still Being Wrote up for this Reason.And I was like" I am Confused because you Told me Last Week it was Ok to Sometimes Work Lanes from Back to Front but Soon as I Do it...I'm Being Wrote up"??And Carl Even Confirmed that He had to go Confront both the Women Later that day because one of them From Aisle 18 just Verified the Unit Count but didn't finish the Pallets and Orders or fill Out Travel Tags the same thing they want to Now hold me Accountable For.And Once Jade and Carl Both Left the Meeting that's when Lorenzo Walked in the Room(The Shop CHairman)and Diamond Told Him Everything Jade Admitted to doing and Mr.Lorenzo Stated "you Can't do that ,you Can't Play with the Rules to your Benefit and Discretion as A Supervisor"So Mr Clemente Guzman now you have All the Facts Sir
Please Stand on Business and get this Grievance Dismissed.

Diamond Holbert Statement

Diamond Holbert Statement on this Case

Diamond Holbert <diamondholbert86@gmail.com>
Fri 9/13/2024 12:52 AM
To:Clemente Guzman <guzman_clemente@att.net>

**Me , Diamond Holbert was a witness to jayde the supervisor admitting she let two other associates work the lanes backwards & stated it twice . She mentioned she spoke with the associates and when Mr. Jerry asked if they got wrote up as well she made the comment she had conversations with them .**

9/13/24 Diamond Holbert

Exhibit C

TJX®

# Medical Leave Status Letter

August 29, 2024

Jerald Coney
5409 Wild West Dr
Arlington, TX 76017

AIN: 996487891
Case #: HRC6822930

HR XPRESS has reviewed your leave of absence request. The below summarizes the details of your leave:

## Time Off

Approved From: 08-21-2024 To: 09-19-2024

**Expected Return To Work Date** (based on information received to date): 09-20-2024

The Company's policy typically provides for Medical Leave of Absence of up to six months for Non-Exempt Associates (approximately 02-18-2025 in your case). At that point, the Company evaluates the individual circumstances of each Associate to determine whether an extension beyond this period would be a reasonable accommodation.

## Pay

☑ Sick/STD Pay Approved From: 08-21-2024 To: 09-19-2024

☑ A 7-day waiting period applies before STD begins. If available, sick time will be used during this period. If available sick time exceeds the 7-day waiting period, it must all be used before STD begins. Your Manager/DC Human Resources must contact Payroll to issue sick time.

## Job Protection

You will receive a separate "Notice of Employee Rights and Responsibilities" with details about any federal or state job protection available to you.

## ACTION NEEDED

☑ Please complete and return the enclosed Extension Form by 09-19-2024, if you are medically unable to return to work on this date. Please contact your Manager/DC Human Resources two weeks before your expected to return to work date. Failure to submit this form or return to work as expected may be treated as resignation of employment.

If you have questions regarding your leave of absence, please call HR XPRESS at **1-888-627-6299**, and press the "**Disability/LOA**" option.

Enclosures: Extension Form ☑ Hourly LOA FAQ ☑
cc: Jayde Casey, D/C Supv, HomeGoods Distribution Center Fort Worth

Fwd: Exhibit D

From: jerry coney (jerryconey96@gmail.com)

To: kayconey2009@yahoo.com

Date: Monday, August 10, 2026 at 06:26 AM CDT

Meeting excusing Lay-up employees from write ups during until retrained

---------- Forwarded message ---------
From: **jerry coney** <jerryconey96@gmail.com>
Date: Mon, Aug 10, 2026, 5:40 AM
Subject:
To: jerry coney <jerryconey96@gmail.com>

Monique Morales <monique_morales@tjx.com>
**Sent:** Wednesday, September 18, 2024 9:55 PM
**To:** Clemente Guzman <guzman_clemente@att.net>
**Subject:** lay up talking point

Good Evening,

Below you will find the overall notes from the lay-up conversation that took place with the teams

*The last week in July there was a meeting with the Lay-up team*

*Subject: Lay-up Math*
*Details:*
*Change to the math in the lay-up process*
*Changing the formula used for the math equation for inner packs and cartons and how the equation is to be*
*Due to this change being new, leaders would not be holding associates accountable if they were to use the p*
*Leaders will allow associates time to adjust to this change*

Warm Regards

Exhibit E

# HomeGoods DC/ Layup Expectations

- I have received a copy of layup Best Practices and will practice Best Practices while working.
- I will ensure I have all my tools needed to work with me at all times.
- I am aware that I can only have a clear water bottle with clear liquid on the DC floor.
- I will not use cell phone or any type of personal electronic devices on the DC floor.
- I will work in my area until the bell rings for break and will not leave my area early for break.
- I will return from break on time and be back in my area when the break ends and the bell rings.
- I will work orders from front to back in my lanes and not skip or pick and choose orders.
- If I have a damaged item in my order, I will damage it out.
- I am aware that it should take only 30 mins to clear a lane.
- I am aware that it is expected to work 150 cartons per hour.
- I will work with a sense of urgency with no idle time.
- If I have a problem in my lane, I will put up a blue stop sign that is filled out in detail what the problem is and then move onto the next order.
- If I need MC, I will hang a blue stop sign that is filled out. I will not leave my lane to go find them.
- I will work every other lane in my assigned door set to ensure that a lane in front of every door can be cleared for receivers.
- I will work I/P orders first and follow the procedure if I have an I/P at the end of shift.
- When I cannot find work, I will go find my supervisor for further direction on what to do.
- I will be in my area at start of shift 6am, if not I am aware that I will be late.
- I will not come up to my area until 4:10pm to put my things away. I will continue working until 4:10pm and not leave until then.
- When I leave my area or if I need to leave early, I will notify a supervisor or LP. I am aware that this is a safety violation if I do not.
- I will always follow all safety rules, including:
    - Being aware of PIT drivers and not walking between the vehicle and the blue light. Having my vest fully closed, longer than shoulder length hair pulled back and up, only clear bags on the floor, using designated walking paths and crosswalks, and not walking in front of AMS vehicles.
- I will be aware of my surroundings and practice ABBI. (Above, Below, Behind, In front)
- I will take my time filling out my ILOG correctly and turn it in daily.
- I am aware I cannot have more than 3 ILOG returns in a rolling 30-day period.
- I am aware that violation of any of these expectations I will be held accountable by management to various levels including a coaching, to a 1st written warning, 2nd written warning, 3rd written warning and up to termination.

Associate Name: Jenuio Doney

Associate signature: [signature]

Date: 06/04/24

Exhibit F

HomeGoods HOMESENSE

# ASSOCIATE TERMINATION NOTICE

HR INITIALS KH
AGM INITIALS [signature]

Associate's Name: Jerald Coney

Supervisor's Name: Jayde Casey

AIN: 996487891

DEPT: Layup

DOH: 4/1/2024

WARNING: ☐ 1st Written ☐ 2nd Written ☐ Final Written ■ Termination ☐ Suspension

Previous Corrective Action: Violation of Rules

Date of Issue: 8/13/2024

Date/Time of Violation: 8/15/2024

Place Violation Occurred: Layup

## NATURE OF VIOLATION

Failure to Meet DC Standards

Safety Violation? ☐ *Check box if yes*

Jerald Coney is receiving this termination for Failure to Meet our Fort Worth HomeGoods DC Standards. Jerald has previously been presented with a written for demonstrating best practices and meeting layup expectations, most recently 8/13/24. On 8/15/24, Jerald was observed working an order where he did not complete his travel tags or get signatures for his overages. It is an expectation of all Homegoods associates to follow best practices and department expectations.

Any further instances of inappropriate behavior and/or violation of company policy will result in further disciplinary up to and including termination of employment

ASSOCIATE'S REMARKS

*The absence of any statement on the part of the Associate indicates their agreement with the report as stated*

I have entered my version of the matter above. I have read this "termination", understand it, and have received a copy.

Sent via mail 8/28/24
ASSOCIATE'S SIGNATURE DATE

[signature] 8-20-24
OPERATION MANAGER SIGNATURE DATE

Diamond Holbert 8/28/24
UNION STEWARD SIGNATURE DATE

[signature] 8/28/2024

[signature] 8-28-24
SUPERVISOR SIGNATURE DATE

Please Select from List:
1st Written Warning
2nd Written Warning
Final Written Warning
Termination
Suspension
N/A

Please Select from List:
Failure to Meet DC Standards
Violation of Rules
Exceeded No Fault
3 Day Unreported Unexcused Absence (NCNS)
Violation of Safety Rules
Failure to follow Directions

Exhibit G

# Fwd: Screenshot (Apr 15, 2025 7:29:32 AM)

From: jerry coney (jerryconey96@gmail.com)

To: kayconey2009@yahoo.com

Date: Monday, August 10, 2026 at 09:22 AM CDT

April 15, 2025 Tax Day

---------- Forwarded message ---------
From: **jerry coney** <jerryconey96@gmail.com>
Date: Tue, Apr 15, 2025, 10:08 AM
Subject: Screenshot (Apr 15, 2025 7:29:32 AM)
To: <jhervey2850@att.net>
Cc: Clemente Guzman <guzman_clemente@att.net>, <monique_morales@tjx.com>, Manuel Quinto-Pozos <mqp@ddoll

Ms Hervey I read our Contract last Night and noticed this Paragraph under Arbitration part b. And I Took a Screenshot so
No Party from the Employer or the Union will be able to take Any Disputes to Court only to Compel Arbitration, as provide
Arbitrator.This provision shall be a Complete DEFENSE to any ACTION INSTITUTED CONTRARY to the AGREEMENT..
So by this Language I Understand it to Mean that any Action or Disciplinary Step that is Set in motion is Contrary which A
almost a 100 Percent Chance that my 1 st Disciplinary Write -up that was on 06/26/24 and Our Cba Contract wasn't Signe
Now I Noticed at the Top of Our Contract it has a date of April 1, 2024-Mar 31, 2027...So I Went and Look up the Home G
Tucson,Arizona and I Noticed the date at the Top of their Contract Shows :Oct 1,2022-Sep 30,2025 and at the Bottom of t
Both Parties the Union and the Employer 5 Months after the Date on the Top of their cba Agreement but I Also Noticed in
Renewal: that States the Agreement shall be in Effect since the 1 day of October ,2022 to and including the 30 th day of S
even though the date at the Top of this Agreement don't Match the Effective date of Execution Signed by the Union and th
This Article 43, Titled Expiration Explains Specifically that All the days Listed at the Top of this Agreement Shall be in Eff
action or Disciplinary Steps or Terminations Administered during those dates
.Now Our Agreement don't have This Language or Article at All in our Contact.This is what our Contract states(Home Goo
Workers of the Southwest Regional Joint Boards)at the Bottom of our Contract for Article 43. The Entirety
Of the Agreement :It is mutually Agreed and Acknowledged that this Agreement represents the Entire Agreement of the p
Written Agreement signed by both parties
Then underneath that Article that's When the Contract is Showing Both Parties The Employer and Union Signing the Con
...Now based on this Language I Understand it to Mean that this Entire Contract is Fully in Effect on O7/12/24 because Ur
Arizona it Specifically Spells it Out on the Effective dates Covered because their Contract is Similar to Ours in Where the
the Employer are Different from the Dates at Top and the Bottom of the Contract.
Now Let's Bring up This First Write-up that I have Been Mentioning this Whole Process were Clemente Guzman said the
even Went through my old Email where I emailed him during that Time period Months ago and Seen where I Asked him "i
this Cba Agreement because I was Focused on the Write-up at that Time stating I clock in on Time but saying I wasn't in r
informed me That I had Signed a Best Practices and Expectations for the Lay-up Department on 06/04/24 and the Write-u
Accountable for this Write-up and I Noticed When Clemente Guzman First informed me about Arbitration He made it a Po
Termination Greiavance at Arbitration I Told him then I don't Understand or Agree with that I Stated Then and Now One G
Didn't get Terminated for one Write-up I got Terminated because of the Progression of All The Disciplinary Steps Per the C
Then after of Two Months of Countless Text Messages and phone Calls to the Attorney hired By the Union that's Suppose
Giving me the Best Chance to Win my Arbitration.And this is 4 Months After my Arbitration Case has been Filled I had to I

Outside Source because I have Text Messages Where Clemente Guzman tells me that Jean Hervey instructed him Not tc
Supposedly to Help me because he Will Contact them when it's Appropriate Timing in Accordiance with my Arbitration da
Then When I Finally Speak to Manuel Quinto-Pozos on our First phone of only Two Calls Total and this was Last Week S
Attorney that's is Supposed to help me When the Case is Under 30 days to my Actual Arbitration Case date May 6, 2025
First Write-up and The Concerns I had about the Language For Interpretation of this Write-up and he Entertained my Inqu
Stated Where Not going to Keep Talking about this because We want Even bring up your First Write-up at Arbitration and
Greiavance and Stated I have Went Over the Hour I had Set for you Let's Talk again The Next day.Then on the Next day I
are you Today and I Stated "Well Actually I'm in Pain "And I Asked him Did you Ever See my Pics from the Shingles and h
that's Not Important because Where not going to Add your Medical Conditions to this Arbitration and I Stated Can you Ev
Arbitration Cases and He Told me No I don't have to Tell you Anything about himself and he was Hired by the Union So a
of The Unions Money.Now Keep in Mind I only have about 3 Weeks to Arbitration and We Talked the day before about a h
Call he don't have Time to Tell me Anything about Himself but your Representing me and I'm just Supposed to Listen hir
gone Pursue or Even Talk about in my Arbitration Case.

Then you Write me Yesterday Jean on April 14, 2025 Make it Point how Unnecessary it is For me to Keep Bringing up thi
to Represent Myself but you didn't Send in Language from the Cba to Validate your Claim.

Then you Tell me I Have to Keep Manuel Quinto-Pozos as my Attorney and you Suggested if I want Any Chance to Vindic
Arbitration and basically I am Not Allowed to Represent Myself and you Stated I can Hire Another Attorney but The Attorn
Approves then he can Attend and Listen? Once Again Show me the language in the Cba that Supports your Claim ?

But Actually it's Doesn't Matter because I Think all The Evidence I Have Will Show and Prove that you and Your Team Kn
Untimely to the Cba Contract making an Award Appeal Almost a 100 Percent Rejection due to the language in this Cba u
So Now I will be Consulting with my Attorney to File a Lawsuit Against Home Goods and the Union and I got a Response
me to Submit all my Information to Start Investigating The Union and Home Goods Incompliance behavior and Malicious
Representation Will Easily be Revealed from the Continuous Disregard to my Requests to get My Attorneys Information o
Idea .And Even asked you Yesterday Jean Hervey to Call me to see if we Could Come some Type of Resolution but Yet y
Arbitration Case because I have Been Harassing The Attorney and the Union because I Kept Calling and Emailing the Pe
One Responded For Months and Months.

So you call me Today or Email me and Explain the Language of this Contract and Let me know what im Reading isn't a F
with a Write- up Outside the Score of the Cba Agreement??

So I will be Retaining an Attorney This Week so I Can File before the Deadline Luckily I Still have Time

Screenshot_20250415-072932.png
219.1

# SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

This Settlement Agreement and Release of Claims ("Agreement") is made and entered into by and between the HomeGoods Fort Worth Merchants, LLC ("HomeGoods" or "the Company") and the Southwest Regional Joint Board, Local 2846 ("Union"), and Jerald Coney ("Grievant" or "Mr. Coney") (HomeGoods, the Union, and Mr. Coney are referred to collectively as "the Parties"). The effective date of this Agreement shall be the date on which it is signed by all Parties.

**WHEREAS**, the Union and Mr. Coney notified HomeGoods of their intention to arbitrate HomeGoods's decision to terminate the employment of Mr. Coney (the "Arbitration");

**WHEREAS,** the Parties have come to agreement with regard to resolution of the issues contemplated by the Arbitration, and the Parties agree to settle fully and finally all claims arising out of Mr. Coney's employment and the Arbitration without resort to further dispute resolution;

**NOW, THEREFORE**, for good and valuable consideration, the sufficiency of which is acknowledged hereby, and in consideration of the mutual covenants and undertakings set forth herein, the Parties agree as follows:

**1.** **<u>No Admission of Liability:</u>** This Agreement and compliance with this Agreement is not, and shall not be considered, an admission by HomeGoods or the Union of any violation of the rights of Mr. Coney, the Union or any other person, or of any violation of any law, statute or rule on the part of HomeGoods or any of its officers, employees or agents or on the part of the Union.

**2.** **<u>Consideration:</u>**

(A) HomeGoods shall pay to Mr. Coney the gross sum of Ten Thousand Dollars ($10,000.00), less required deductions and withholdings ("Settlement Payment") in consideration

for Mr. Coney's release of all claims (as set forth in paragraph 4 hereof) and his agreement to be bound by all terms of this Agreement. This payment shall be treated as wages, shall have required deductions and withholdings taken from it, and HomeGoods will document the payment on a W2 form issued to Mr. Coney in the ordinary course of business.

(B) The Union and Mr. Coney agree that the Settlement Payment constitutes the entire amount of monetary consideration to be provided by HomeGoods under this Agreement, and that they will not seek any further compensation for any claimed damages, attorneys' fees and/or costs incurred in, arising out of, or connected with, the Arbitration.

(C) The Settlement Payment will be paid by HomeGoods no later than thirty (30) business days after the effective date of this Agreement.

3. **Release of Claims:** For the consideration set forth in Paragraph 2 and the entry into this Agreement by HomeGoods, Mr. Coney and the Union hereby release and forever discharge HomeGoods, its parents, subsidiaries, and affiliates ("Released Parties") of and from any and all actions or causes of action, suits, debts, claims, charges, complaints, contracts, controversies, agreements, promises, expenses, damages, cross-claims, claims for contribution and/or indemnity, claims for costs and/or attorneys' fees, judgments, losses, liabilities and demands whatsoever, in law or equity, which she ever had, now has, or may have, against the Released Parties for anything that has occurred up to and including the date of this Agreement, whether known, unknown, or suspected, asserted or unasserted, to include claims for breach of contract and claims under any federal or state statute (including but not limited to the National Labor Relations Act, Title VII of the Civil Rights Act of 1964, the Family and Medical Leave Act, the Americans with Disabilities Act, and any other statutory scheme applicable to Mr. Coney's employment or cessation thereof and to the relationship between the Union and HomeGoods, claims under Chapters 21 and 451 of the Tex. Lab. Code (prohibiting

discrimination based on race, color, disability, religion, sex (including pregnancy, childbirth or related medical conditions), national origin (including ancestry), age (40+), and genetic information and testing) and discrimination and retaliation based on filing a workers' compensation claim), contract law, common law, or decisional law, as well as claims of retaliation of any kind, claims for negligent and/or intentional infliction of emotional distress, for alleged interference with any contract, economic opportunity or prospective economic advantage, or for alleged violation of any federal, state or local law, regulation, ordinance or common-law duty relating to, arising out of, or having any bearing whatsoever on, Mr. Coney's employment by HomeGoods. Mr. Coney does not waive any claims that are not waivable and does not waive any claims for retirement benefits in which he is vested. Mr. Coney represents that other than the Arbitration, he has not filed any other grievance, lawsuit, administrative charge, or complaint pertaining to his employment or cessation thereof as of the date of this Agreement.

4. **Confidentiality; Without Precedent or Prejudice**: The Parties agree that the terms and fact of this Agreement shall be kept confidential unless compelled by legal process or unless required by business needs of HomeGoods. The parties further agree that this agreement is without precedent or prejudice with regard to its fact and its terms.

5. **Fair Representation:** Mr. Coney hereby agrees that he has been fairly represented by the Union throughout the grievance and arbitration process and otherwise regarding the termination of his employment.

6. **Entire Agreement:** This Agreement constitutes the entire agreement and understanding reached by the Parties concerning the subject matter of this Agreement. This Agreement supersedes any and all prior negotiations and agreements (actual or proposed and whether written or oral). The Parties to this Agreement explicitly acknowledge that they have

not relied upon any promise, representation, or warranty, express or implied, not explicitly contained in this Agreement. No provision of this Agreement can be changed, altered, modified, or waived except by an executed writing by the Parties.

7. **Governing Law:** This Agreement shall in all respects be interpreted, enforced, and governed by the laws of the State of Texas, except where federal law may govern.

**BY SIGNING THIS AGREEMENT, MR. CONEY ACKNOWLEDGES:**

A. HE HAS READ IT;

B. HE UNDERSTANDS IT AND KNOWS HE IS GIVING UP IMPORTANT RIGHTS;

C. HE AGREES TO COMPLY WITH EVERYTHING IN IT;

D. HE HAS BEEN ADVISED AND IS HEREBY ADVISED TO CONSULT WITH AN ATTORNEY PRIOR TO EXECUTING THIS SETTLEMENT AGREEMENT AND GENERAL RELEASE; AND

E. HE HAS SIGNED THIS SETTLEMENT AGREEMENT AND GENERAL RELEASE KNOWINGLY AND VOLUNTARILY.

Dated: ____________, 2025

______________________________
Southwest Regional Joint Board, L. 2846
By: Its Authorized Representative

Dated: ____________, 2025

______________________________
HomeGoods Fort Worth Merchants, LLC
By: Its Authorized Representative

Dated: ____________, 2025

______________________________
Jerald Coney

In WITNESS WHEREOF, the parties have caused this Agreement to be signed as of heretofore set forth by their duly authorized representatives.

By: ______________________ Date: 7/12/24
Meg Eifield, Assistant t Vice President,
Director of Labor Relaations

By: ______________________ Date: 7/12/24
ean Hervey, EXVP Worker's United

Fwd: Exhibit J

From: jerry coney (jerryconey96@gmail.com)

To: kayconey2009@yahoo.com

Date: Monday, August 10, 2026 at 06:33 AM CDT

Emails to Tiffany Morris who is part of the Investigation team for SEIU

---------- Forwarded message ---------
From: **jerry coney** <jerryconey96@gmail.com>
Date: Fri, Jun 6, 2025, 12:39 PM
Subject:
To: <tiffany.morris@seiu.org>

Ms. Tiffany Morris how are you and today is Friday 06/06/25 and I was retracting some emails to gather a Timeline for So
Malicious Process I have Experienced
with Home Goods/Workers United Union in my Wrongful Termination Case while I was on Approved Medical Leave. and
the Parent Union Company with Workers United
being 1 of Many Afiliates that they have underneath the International Figure Head. I just Noticed my Inquiry went out to tl
Department on April 11, 2025
and you emailed me and said had received my Inquiry
Which Fully Explained how the Local Union under Jean Hervey (VP) and Clemente Guzman (BA) had Totally kept the Att
and Refused to give me his Contact information from the Intial Arbitration filing date in Late November, 2024 and For Ove
And Still refused and Never did give me his Contact information plus I Explained the Attorneys non Compliance behavio
on April 11, 2025 and I just Noticed you replied on May 8, 2025 well over 25 days Later ?
And That's when you sent the Response from the International President Ms. April Verrett who told me that this matter wa
sent the issue back to my Local to Handle
So Ms Morris please email me back or Call me and First Explain why Did it Take So long for you or the SEiU Concerns De
Information?
And I Also Noticed the Letter Ms. April Verrett Sent me was Dated for April 16, 2025 that it was Issued. So why did I Rece
8, 2025 that's About Twenty Three Days Later over 3 weeks??

So Ms Morris can please Explain to why Such a Long Time to Inform me of Such Important information??
And Can you have Ms April Verrett Explain to me Why as the International President why She Wouldn't have the Authority
for Further Investigation? To make Sure an Union Member is getting the Adequate and Fair Representation that is Requir

Please Ms Tiffany Morris or Ms April Verrett Reply and Answer those Questions for me Please
And if I'm Mistaken please Clarify so I will be more Knowledgeable of the SEIU Constitution and By laws as of 2024.

jerryconey96@gmail.com
817-680-0626 Cell #

Exhibit K

# Fwd: Ms Lynne Fox Did you receive my last Email?? It's Very Important that I get your Feedbac

From: jerry coney (jerryconey96@gmail.com)

To: kayconey2009@yahoo.com

Date: Monday, August 10, 2026 at 06:32 AM CDT

---------- Forwarded message ---------
From: **jerry coney** <jerryconey96@gmail.com>
Date: Fri, Apr 4, 2025, 3:57 PM
Subject: Ms Lynne Fox Did you receive my last Email?? It's Very Important that I get your Feedback.. . Please Read and I
To: <lynnefox@amalgamatedbank.com>

Ms Lynne Fox my name is Jerald Coney I sent you Email Yesterday on Thursday April 3, 2025 and Today is Friday April 4
2025 and I have Some Major Concerns I want to Address with you on Potential Retaliation I'm Suspicious of before my Ar
Important person with Alot to Focus on and my email Could Easily be Overlooked Unintentionally so that's Why I'm Reach
Emails will Catch your Attention? Please if you can reached out to ASAP Please my Cell number is

817-680-0626
Can call me Anytime 7 days a Week
jerryconey96@gmail.com

Once Again please reach out to me before you Contact anybody from the Union Reps in my Division which would be Jen

And I'm asking you Respectfully to Please Consider me and my request of Confidentiality in this Matter and Contact me s
If you can Honor my Wishes I would greatly Appreciate it .